1

2

3

4

5

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   LYNDA WEAVER,                              CASE NO. CV F 05-0322 AWI LJO

12                     Plaintiff,              **FINDINGS AND RECOMMENDATIONS ON**
                                               **SOCIAL SECURITY COMPLAINT**
13          vs.                                (Docs. 22, 25.)

14   JO ANNE B. BARNHART,
     Commissioner of Social
15   Security,

16                     Defendant.
                                          /
17

18                          **INTRODUCTION**

19          Plaintiff Lynda Weaver ("plaintiff") seeks this Court's review of an administrative law judge's

20   ("ALJ's") decision that plaintiff is neither disabled nor entitled to Supplemental Security Income ("SSI")

21   under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1382c.  Based on review of the

22   Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart,

23   Commissioner of Social Security ("Commissioner"), this Court RECOMMENDS to DENY plaintiff's

24   request to reverse the Commissioner's decision to deny plaintiff SSI or to remand for further

25   proceedings.

26                          **BACKGROUND**

27                    **Plaintiff's Personal Background**

28          Plaintiff is age 47, has a high school education and two years of college, and worked as a

                                          1

1   certified nursing assistant after completing a training program.  (AR 18, 45, 48, 119, 133, 138.)

2                                    **Administrative Proceedings**

3                                    *Plaintiff's Original Application*

4         On July 19, 1996, plaintiff protectively filed her SSI application to claim disability since July 1,

5   1996. (AR 78.) The Social Security Administration ("SSA") denied plaintiff's SSA application initially

6   on October 16, 1999. (AR 17.)  Plaintiff filed a February 4, 1997 request for an ALJ hearing.  (AR 78.)

7   After a June 9, 1998 ALJ hearing and a November 20, 1998 supplemental ALJ hearing, the ALJ issued

8   his April 27, 199 decision to find that plaintiff has the residual functional capacity for sedentary work

9   with limitations of occasional crouching and climbing stairs, avoiding uneven terrain and a sit/stand

10  option. (AR 85.)  The ALJ further found plaintiff is able to perform a significant number of jobs in the

11  national economy and is not disabled.  (AR 85.)

12                                   *Plaintiff's Current Application*

13        On December 19, 2001, plaintiff filed her SSI application to claim disability since July 1, 1996

14  due to hands, hips, tail bone and knee pain, arthritis, Blounts disease, Schneider corneal dystrophy,

15  reduced vision, eye surgery, heart murmur, hypertension, diabetes, shoulder bursitis, compressed

16  vertebrae, and depression.  (AR 119, 132.)  With its May 8, 2002 Notice of Disapproved Claims, the

17  SSA denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent

18  her to work.  (AR 104.)  On June 25, 2002, counsel was appointed for plaintiff.  (AR 36.)  On July 10,

19  2002, plaintiff filed her Request for Reconsideration to claim she is "totally disabled."  (AR 108.)  With

20  its September 6, 2002 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that

21  plaintiff's condition is not severe enough to prevent her to work.  (AR 109.)

22        On September 18, 2002, plaintiff filed her Request for Hearing by Administrative Law Judge to

23  claim that she is "totally disabled."  (AR 114.)  After an August 12, 2003 hearing (AR 40), the ALJ

24  issued his March 23, 2004 decision to find that plaintiff has the residual functional capacity to perform

25  a significant range of sedentary work, is not disabled, and thus is ineligible for SSI.  (AR 24-25.)

26        Plaintiff submitted to SSA's Appeals Council her May 21, 2004 Request for Review of Hearing

27  Decision.  (AR 12.)  On January 5, 2005, the Appeals Council denied plaintiff's request to render the

28  ALJ's March 23, 2004 decision subject to this Court's review.  (AR 5.)

                                                2

**Medical History And Records Review**

***William Halls, M.D., Treating Gynecologist***

Since 1981, plaintiff treated with gynecologist William Halls, M.D., for routine gynecological needs. (AR 171-190.) Plaintiff's most recent January 15, 1997 examination was unremarkable. (AR 171.)

***Paul W. Ostoya, M.D., Treating Physician***

Plaintiff treated with Paul W. Ostoya, M.D., whose May 4, 1999 and December 17, 2001 physical examinations were generally normal. (AR 210-211.)

***Mohinder S. Poonia, M.D., Treating Internist/Cardiologist***

Plaintiff treated with internist and cardiologist Mohinder S. Poonia, M.D. ("Dr. Poonia"), who on April 6, 1998 noted plaintiff's heart murmur. (AR 341.) On May 13, 1999, Dr. Poonia noted plaintiff's osteoarthritis of her knees and prescribed Motrin 800 mg. (AR 334.) On November 2, 1999, plaintiff complained of feeling depressed, and Dr. Poonia prescribed Paxil 10 mg. (AR 333.)

On April 14, 2000, Dr. Poonia noted plaintiff's knee joint deformation and diagnosed osteoarthritis of her knees and depression. (AR 267.) On June 20, 2000, plaintiff complained of pain and numbness to her hands and weak grip. (AR 266.) Dr. Poonia assessed carpal tunnel syndrome. (AR 266.) Plaintiff did not show for August 2000 nerve conduction studies. (AR 264.) An October 6, 2000 sensory nerve conduction threshold test revealed as to plaintiff's left side "very mild sensory dysfunction" and "very mild hyperesthetic condition" and as to plaintiff's right side "no abnormal measures." (AR 262.) On October 17, 2000, Dr. Poonia treated plaintiff for painful left elbow and high blood pressure, assessed left elbow acute bursitis, and prescribed Celebrex 200 mg. (AR 260.)

On January 22, 2001, plaintiff complained of left knee problems for which Dr. Poonia assessed osteoarthritis and prescribed Motrin 800 mg. (AR 259.) On June 7, 2001, Dr. Poonia assessed advanced osteoarthritis of plaintiff's knees and prescribed Motrin 800 mg. (AR 252.) On June 18, 2001, Dr. Poonia assessed corneal dystropathology and diabetes mellitus. (AR 251.) On November 26, 2001, Dr. Poonia assessed osteoarthritis to plaintiff's knees and diabetes mellitus. (AR 249.)

On January 23, 2002, Dr. Poonia assessed vision loss and osteoarthritis of plaintiff's knees and ankles. (AR 244.) Dr. Poonia referred plaintiff to an ophthalmologist to address her vision loss. (AR

3

240.)  On April 8, 2002, Dr. Poonia assessed corneal dystropathology and prescribed Motrin 800 mg, Vicodin and Vasotec.  (AR 237.)  On June 12, 2002, plaintiff continued to complain of knee joint pain. (AR 236, 329.)  Dr. Poonia assessed a heart murmur.  (AR 236, 329.)  On September 20, 2002, plaintiff was assessed with osteoarthritis to plaintiff's knees and hypertension.  (AR 328.)  On October 28, 2002, plaintiff was assessed with diabetes mellitus, hypertension, depression and heart murmur and continued to treat plaintiff with medication.  (AR 325.)

On January 24, 2003, plaintiff complained of knee pain and was assessed with obesity, diabetes mellitus, hypertension and depression.  (AR 324.)  On February 9, 2003, plaintiff treated for high blood pressure symptoms.  (AR 323.)

Dr. Poonia completed a February 9, 2003 Complete Medical Report (Physical) to note that plaintiff "is very limited to physical exertion due to condition of knees and other health conditions." (AR 308.)  Dr. Poonia diagnosed diabetes mellitus, obesity, hypertension, heart murmur, knee surgery and corneal dystrophy.  (AR 308.)  Dr. Poonia's prognosis was guarded.  (AR 308.)  Dr. Poonia assessed that plaintiff is unable to lift/carry, stand/walk, use her left foot, climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push/pull, hear, or speak.  (AR 309, 310, 311.)  Dr. Poonia noted that plaintiff is able to: (1) sit one our in an eight-hour workday; (2) lie/elevate three hours in an eight-hour workday; (3) occasionally engage in simple grasping and fine manipulation with her right hand; and (4) occasionally use her right foot.  (AR 310.)

On April 3, 2003, plaintiff was assessed with chest pain/pressure and osteoarthritis to her knees. (AR 322.)  On May 27, 2003, plaintiff complained of low back pain.  (AR 319.)  On August 8, 2003, plaintiff complained of left lower back pain.  (AR 313.)

With his December 8, 2003 letter to Dr. Poonia, the ALJ indicated that the ALJ "cannot give much weight" to Dr. Poonia's February 9, 2003 Complete Medical Report (Physical) unless it is supported with information, including bases for conclusions regarding any limitation and whether Dr. Poonia's "opinions regarding functional capacity are based on subjective limitations as stated by the claimant."  The ALJ asked Dr. Poonia to "sign any such clarified assessment *under penalty of perjury*." (Italics in original.)  In response, Dr. Poonia provided reports of January 21, 2004 x-rays of plaintiff's knees and left femur.  (AR 347-349.)  According to the reports, the x-ray of plaintiff's right knee

1   revealed advanced osteoarthritic changes and the x-rays of plaintiff's left femur and knee revealed mild

2   changes of osteoarthritis.  (AR 348, 349.)

3                                   *University Medical Center*

4            On April 28, 2001, plaintiff presented to the University Medical Center emergency room and

5   complained of left shoulder pain with decreased range of motion.  (AR 191, 193.)  Plaintiff was

6   diagnosed with left subacromial bursitis.  (AR 194.)

7                              *Fogg, Maxwell & Lanier Eye Care*

8            Plaintiff treated with Fogg, Maxwell & Lanier Eye Care and on June 18, 2001, complained of

9   changes to her eyes, blurry vision and difficulty reading and driving.  (AR 200, 305.)  Plaintiff noted

10  night vision difficulty to prevent her to drive.  (AR 305.)  On July 6, 2001, plaintiff was diagnosed with

11  "diabetes adult control no retinopathy."  (AR 198, 302.)

12           On January 23, 2002, plaintiff complained of blurred vision with glasses and fluttering sensation.

13  (AR 301.)  Plaintiff was diagnosed with corneal dystrophy.  (AR 301.)  On January 2, 2003, plaintiff

14  complained of vision difficulty and was diagnosed with corneal dystrophy and cataracts.  (AR 300.)

15           Ophthalmologist Steven Fogg, M.D. ("Dr. Fogg"), completed an August 26, 2003 questionnaire

16  to note that plaintiff's visual impairments prevent her to drive and cause difficulty to judge distances.

17  (AR 306.)  Dr. Fogg further noted plaintiff's poor night vision, and limited ability to handle fine objects

18  and to manipulate larger objects at close distance.  (AR 306.)  Dr. Fogg recommended that plaintiff not

19  work around heights, dangerous equipment or moving machinery and noted that glare blinds plaintiff.

20  (AR 306.)  Dr. Fogg noted plaintiff's best corrected vision of 20/40 in her left eye and 20/30 in her right

21  eye.  (AR 307.)

22                       *Rustom F. Damania, M.D., Consultative Internist*

23           Internist Rustom F. Damania, M.D. ("Dr. R. Damania"), conducted a February 20, 2002

24  consultative examination of plaintiff.  (AR 219.)  Plaintiff informed Dr. R. Damania that she does not

25  have a driver's license because her poor vision prevents her to pass the driver's license test.  (AR 219.)

26  Plaintiff complained that her knees hurt and swell and noted surgeries to her knees.  (AR 219.)  Plaintiff

27  informed Dr. R. Damania that plaintiff does not need a cane but has had frequent recent falls.  (AR 219.)

28  Plaintiff complained of impaired vision in both eyes.  (AR 219.)  Dr. R. Damania found plaintiff

cooperative and "did not observe any major signs of depression, anxiety, panic or paranoia." (AR 220.) Plaintiff '[a]nswered all questions and followed all instructions." (AR 220.)

Dr. R. Damania assessed plaintiff's vision as 20/70 in both eyes and 20/50 in both eyes with glasses. (AR 220.) Dr. R. Damania noted restriction in gross field of vision. (AR 220.) Dr. R. Damania's examination revealed swollen knees with "generalized tenderness" and moderate deformities "particularly noticeable when she tries to walk." (AR 221, 224.) Dr. R. Damania further noted crepitations palpable in plaintiff's knees and that plaintiff's legs appear "slightly bow-shaped" when she walks. (AR 221.) Dr. R. Damania commented: "She did well without the cane but insists that she prefers using the cane particularly on uneven surfaces because of a previous history of falls. Both knee joints do not appear to be unstable." (AR 221.) Dr. R. Damania's examination of plaintiff's extremities, other joints, including her shoulder, and spine revealed normal range of motion and was unremarkable. (AR 221, 224.)

Dr. R. Damania diagnosed obesity, hypertension controlled with no end-organ damage, diabetes mellitus type II, bilateral corneal disease of the eyes, and severe degree of bilateral knee arthritis. (AR 222.) Dr. R. Damania assessed visual impairments and enlarged knee joints with restriction in range of motion with flexion. (AR 223.) According to Dr. R. Damania, part of the restriction may be secondary to obesity. (AR 223.) Dr. R. Damania noted plaintiff's insistence that she is able to walk without a cane. (AR 223.) Dr. R. Damania found plaintiff "ambulatory and most likely requires an assistive device such as a cane to walk on uneven surfaces." (AR 223.) Dr. R. Damania assessed no limitations of exertional, postural with bending or stooping, or manipulative with reaching, handling, feeling, grasping or fingering. (AR 223.) Dr. R. Damania placed limitations on kneeling, climbing and crouching and found no communicative impairments. (AR 223.)

### *Shireen R. Damania, M.D., Consultative Psychiatrist*

Board-certified psychiatrist Shireen R. Damania ("Dr. S. Damania"), conducted a February 20, 2002 consultative psychiatric evaluation of plaintiff. (AR 226.) Plaintiff informed Dr. S. Damania that plaintiff was limited to five minutes standing, had constant pain in her hands, knees, hips and tail bone, and had a compressed L-4/L-5 vertebrae. (AR 226.) Plaintiff noted that she had arthritis of both knees since age 11, had multiple knee surgeries, and lacked right knee cartilage. (AR 227.) According to

plaintiff, she required a total right knee replacement and Vioxx was ineffective for her pain. (AR 227.) As to her mental health, plaintiff noted she did not see a therapist or psychiatrist, cries and had become "a recluse" due to her pain. (AR 227.) Plaintiff explained that she had worked briefly at a convalescent hospital until she became pregnant and has since been unable to work "because of the problems with her knees and the constant pain." (AR 228.) Plaintiff claimed that pain prevents her to go to her mail box daily and that she checks it only once a week. (AR 228.)

Dr. S. Damania's mental status examination revealed that plaintiff was "pleasant, appropriate, and related well" along with plaintiff's mildly anxious and vaguely depressed mood, intact memory, attention span within normal limits, and average intelligence. (AR 228, 229.) Dr. S. Damania assessed adjustment disorder with depressed mood and a 55-60 Global Assessment of Functioning. (AR 229.) Dr. S. Damania observed:

> The claimant is pleasant, appropriate, with excellent interpersonal and social skills. No difficulties were noted in memory, concentration, persistence, and pace. There is no evidence of any emotional lability. She is able to understand, carry out, and remember simple, as well as one and two step job instructions. . . . She is able to respond appropriately to co-workers, supervisors, and the public. She is able to respond appropriately to usual work situations, and any limitations are as a result of the subjective symptomatology of bilateral knee pain. (AR 229.)

### John F. Kwock, M.D., Treating Physician

In his March 12, 2002 letter, treating physician John F. Kwock, M.D. ("Dr. Kwock"), noted that plaintiff has "fairly advanced osteoarthritis of the knee . . . such that hopes of conservative treatment being very effective is probably pretty slim." (AR 232.) Dr. Kwock raised the possibility of a total knee arthroplasty. (AR 232.)

### Non-Examining Physicians

Alfred Torre, M.D. ("Dr. Torre"), a California Disability Determination Services ("DDS") physician, completed a Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 10 pounds occasionally and less than 10 pounds frequently; (2) stand/walk at least two hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4) occasionally balance, stoop, kneel, crouch and crawl. (AR 293.) Dr. Torre noted plaintiff's lower extremities limitations from marked osteoarthritis knee joint. (AR 292.) Dr. Torre placed climbing and far acuity vision limitations. (AR 293, 294.) Dr. Torre placed neither manipulative, communicative nor

1   environmental limitations, except avoidance of hazards.  (AR 294, 295.)  Another DDS physician

2   affirmed Dr. Torre's assessment.  (AR 297.)

3          Psychiatrist Archimedes Garcia, M.D. ("Dr. Garcia"), a DDS physician, completed a May 2,

4   2002 Mental Residual Functional Capacity Assessment to conclude generally that plaintiff is not

5   significantly limited in understanding and memory, sustained concentration and persistence, social

6   interaction, and adaptation.  (AR 288-289.)  Dr. Garcia noted that plaintiff is able to perform simple

7   repetitive tasks on a sustained basis, to relate to others, and to adapt to routine work.  (AR 290.)

8          Dr. Garcia completed a May 2, 2002 Psychiatric Review Technique to assess plaintiff's mild

9   restriction of daily living activities and difficulties in maintaining social functioning and concentration,

10  persistence or pace.  (AR 286.)  On September 3, 2002, DDS physician Evelyn Aquino-Caro, M.D. ("Dr.

11  Aquino-Caro"), agreed with Dr. Garcia's assessment.  (AR 276.)

12                                   *Medical Imaging*

13         A June 7, 2001 medical imaging report noted placement of screws from plaintiff's prior left knee

14  surgery but neither joint effusion nor degenerative changes.  (AR 255.)  As to plaintiff's right femur, the

15  report noted severe degenerative change involving the medial joint compartment.  (AR 256.)  October

16  6, 2004 left hand x-rays revealed degenerative changes predominantly involving the DIP joint and to a

17  lesser extent the fifth PIP joint.  (AR 352-353.)  The x-ray reported stated that the findings "are most

18  compatible with osteoarthritis" and that "[n]o acute pathology of the left hand identified."  (AR 353.)

19                                   *Medications*

20         Plaintiff's medications have included Glyburide 2.5 mg, Vasotec 10 and 20 mg, Motrin 800 mg,

21  Vicodin, Paxil 10 mg, Ibuprofen 800 mg, Enalapril 10 mg, and Pravachol 10 mg.  (AR 129.)

22                       **Plaintiff's Activities And Testimony**

23                          *Reports And Questionnaires*

24         Plaintiff completed a November 8, 2001 Disability Report Adult to note that her ability to work

25  is limited by arthritis, Blounts disease, Schneider corneal dystrophy, reduced vision, eye surgery, reduced

26  vision, heart murmur, hypertension, diabetes, shoulder bursitis, and pain in hands, hips, tail bone and

27  knees.  (AR 132.)  Plaintiff claimed that she is unable to stand for more than five minutes and has

28  difficulty reading.  (AR 132.)  During 1978-1980, plaintiff worked as a certified nursing assistant.  (AR

                                         8

1   133.)  Plaintiff stopped working in September 1980 due to pregnancy and knee pain.  (AR 132.)

2   Plaintiff completed a November 8, 2001 Daily Activities Questionnaire to note that on an average

3   day, plaintiff assists her children to prepare to leave for school and performs "a little housework off and

4   on during the day."  (AR 127.)  Knee pain awakens plaintiff at night.  (AR 127.)  Plaintiff is able to care

5   for herself, to prepare simple meals, to shop once a week, and to wash clothes.  (AR 127, 128, 129.)

6   Plaintiff walks about 100 yards to meet her children at a front gate when they return from school.  (AR

7   128.)  Plaintiff has no problems getting along with others.  (AR 129.)  Plaintiff is forgetful.  (AR 129.)

8   Plaintiff completed a January 10, 2002 Exertional Daily Activities Questionnaire to note that she

9   lived in an apartment with her son, then age 16, and daughter, then age 11.  (AR 153.)  Plaintiff claims

10  that walking 75-100 yards causes her ankles and knees to swell so that she is "no good for the rest of the

11  day."  (AR 153.)  On an average day, plaintiff assists her children to get ready for school and tries to

12  perform light household chores.  (AR 153.)  Plaintiff is afraid her knees will give out when she descends

13  stairs.  (AR 154.)  Plaintiff does not lift groceries or laundry.  (AR 154.)  Plaintiff is able to lift five

14  pounds for 20 feet.  (AR 154.)  Plaintiff is unable to see to drive.  (AR 154.)  Plaintiff sleeps for four

15  hours at night and two or three hours in the morning after her children leave for school.  (AR 155.)

16  Plaintiff uses a cane for her poor balance.  (AR 155.)  Plaintiff is unable to read or watch much television

17  because of her poor vision.  (AR 156.)

18  Plaintiff's friend completed a January 17, 2002 Daily Activities Questionnaire (Third Party

19  Information) to note that on a typical day, plaintiff does not do much and watches "some" television.

20  (AR 157.)  Plaintiff sleeps four to five hours at night and a few hours in the morning.  (AR 157.)

21  Plaintiff is able to dress herself but requires "extra time."  (AR 158.)  Plaintiff's children assist her to

22  prepare simple meals because plaintiff is unable to stand for long.  (AR 158.)  Plaintiff shops once a

23  week with assistance.  (AR 158.)  Plaintiff performs household cleaning in shifts with her children's

24  assistance and is unable to stand "that long."  (AR 159, 161.)  Plaintiff does not drive and uses public

25  transportation.  (AR 159.)  Reading is difficult because of plaintiff's poor vision.  (AR 160.)  Plaintiff

26  attends church when she gets a ride.  (AR 160.)  Plaintiff has no problem concentrating or remembering.

27  (AR 161.)  Plaintiff fears falling.  (AR 161.)

28  Plaintiff completed a July 9, 2002 Reconsideration Disability Report to note worsened knee pain

and depression and that she is unable to engage in prolonged sitting, walking or standing.  (AR 163.)
Plaintiff's daughter assists to tie plaintiff's shoes.  (AR 165.)  Plaintiff does not leave her home because
doing so is "too painful" and her depression worsens.  (AR 165.)

### *Plaintiff's August 12, 2003 ALJ Hearing Testimony*

Plaintiff testified at the August 12, 2003 ALJ hearing that she is 5-foot-4 and weighs 196 pounds.
(AR 46.)  Plaintiff claimed that she had lost 40 pounds during the past six months due to depression.
(AR 46.)  Plaintiff lives with her two children.  (AR 47.)

Plaintiff has a high school diploma and attended two years of junior college but did not achieve
a degree.  (AR 48.)  In 1980, plaintiff completed a six-month nursing assistant program to earn a license
which is no longer active.  (AR 48.)

Plaintiff last worked in December 1980 when she was pregnant.  (AR 48.)  Plaintiff has not
worked since because she is toxemic and hypertensive and has had weight problems.  (AR 49.)

Since plaintiff applied for SSI in 1999, her condition has worsened due to a heart murmur and
knee and vision problems.  (AR 49.)  The heart murmur causes plaintiff's heart to skip beats.  (AR 49.)

Plaintiff has had multiple knee surgeries, including insertion of six-inch plate.  (AR 51.)  Plaintiff
has no cartilage in her right knee, and "[i]t's been bone on bone" for more than 10 years.  (AR 51.)  Dr.
Kwock told plaintiff that the right knee "was totally gone" to require replacement.  (AR 51.)  Plaintiff's
right knee "is always swollen" to preclude "hard weight on it."  (AR 52.)  Plaintiff uses a cane to step
up and down curbs because her knee gives out.  (AR 53.)  A doctor prescribed the cane in 1998.  (AR
53.)

Plaintiff's left knee swells daily with activity but is not as severe as her right knee.  (AR 53.)
Plaintiff has constant pain to her knees, especially grinding to her right knee.  (AR 53.)  To alleviate the
pain, plaintiff takes 1,600 mg of Motrin and a hot bath, elevates her feet and sleeps.  (AR 54.)  Plaintiff
elevates her feet six to eight hours or most of the day.  (AR 54.)  Plaintiff is on her feet no more than an
hour during an eight-hour period. (AR 54.)  Ice, exercise and stretching worsen plaintiff's knee pain, and
plaintiff's doctor told her not to exercise and stretch.  (AR 54-55.)  Plaintiff insists to use a cane all the
time.  (AR 59.)

Plaintiff has arthritis in her fingers, which are starting to deform.  (AR 55.)  Plaintiff is unable

to grasp with her dominant left hand and drops things.  (AR 55.)  Plaintiff's right hand problems are limited to pain.  (AR 56.)  Plaintiff has no limitation with her right hand.  (AR 56.)  Plaintiff estimates she could use her hands for an hour during an eight-hour workday.  (AR 56.)  Plaintiff had no recent nerve testing for her hands although her hands have worsened.  (AR 56.)  Plaintiff does not hand write letters because of pain.  (AR 66.)

Plaintiff estimates that during an eight-hour period, she is able to stand one hour, walk a half hour, and sit two hours.  (AR 67.)  Plaintiff estimates that she is able to lift/carry five to ten pounds.  (AR 67.)  Plaintiff is able to pick up small items except coins and estimates that she can use her hands for an hour during an eight-hour day.  (AR 67, 69.)

Plaintiff does not see well with glasses from a distance.  (AR 62.)  Plaintiff is able to see up to 150 feet before having problems.  (AR 62.)  Plaintiff has problems to focus with close vision to cause problems to perform fine detail work.  (AR 63.)  Plaintiff has crystals covering her corneas to block her vision.  (AR 64.)  Plaintiff could not perform a typing job because she is unable to see even large fonts. (AR 66.)  Plaintiff will need "eventually corneal transplants."  (AR 66.)  Plaintiff does not have a drivers license because she does not see well enough to drive.  (AR 47.)  In 1997, plaintiff failed a California Department of Motor Vehicles vision test.  (AR 47.)

Plaintiff claimed that Dr. R. Damania spent five minutes with her and did not perform an examination as reflected in his report.  (AR 58.)  Plaintiff attempted knee range of motion during her examination with Dr. R. Damania but could not bend her knee.  (AR 58.)  Dr. R. Damania did not perform range of motion testing for plaintiff's back and cervical spine.  (AR 59.)

Plaintiff's medications cause no problems, except an upset stomach from Ibuprofen.  (AR 68.)

On a typical day, plaintiff makes sure her daughter gets on her school bus, watches television, cleans dishes, rests when her back and knees start to hurt, and sleeps.  (AR 68.)  Plaintiff explained: "I don't do a lot.  I mostly watch TV and I'll sometimes try to see if I can, you know, on my daughter's computer read the newspaper online in the big font . . ."  (AR 68.)  Plaintiff cooks simple foods.  (AR 68.)

Plaintiff takes her time to complete tasks and as a result, would experience stress in a work setting.  (AR 50.)  Dr. Poonia suggested plaintiff to avoid stress.  (AR 50.) Plaintiff's biggest stress is

1    yelling at her teenage son.  (AR 50.)

2              *Vocational Expert Judith Najarian's August 12, 2003 ALJ Hearing Testimony*

3              At the August 12, 2003 ALJ hearing, vocational expert Judith Najarian ("Ms. Najarian") testified

4    that plaintiff's certified nurse assistant work was medium and semi-skilled.  (AR 70.)  As a first

5    hypothetical, the ALJ asked Ms. Najarian to assume a person who: (1) is age 44; (2) has college course

6    credits and work experience as a certified nurse assistant; (3) has a combination of severe impairments;

7    (4) retains the residual functional capacity to lift/carry 10 pounds occasionally and up to 10 pounds

8    frequently; (5) is able to stand/walk two hours; (6) is able to sit six to eight hours; (7) is able to

9    occasionally balance, stoop, kneel, crouch and crawl; (8) is unable to climb ropes, ladders or scaffolds;

10   (9) must avoid activities requiring far distant visual acuity; and (10) must avoid moderate exposure to

11   heights and dangerous machinery.  (AR 70-71.)  Ms. Najarian testified that such person is unable to

12   perform plaintiff's past work but could perform sedentary jobs, including cashiering (15,469 jobs in

13   California and 144, 684 jobs in United States), assembly jobs (10,832 jobs in California and 105,975

14   jobs in United States), and production jobs (6,542 jobs in California and 67,595 in the United States).

15             As a second hypothetical, the ALJ asked Ms. Najarian to assume a person who: (1) has the same

16   vocational parameters as the first hypothetical; (2) has a combination of severe impairments; (3) retains

17   the residual functional capacity to lift/carry five pounds; (4) is able to stand one hour, walk 30 minutes,

18   and sit two hours; (5) has difficulties performing bilateral gross and fine manipulation for more than an

19   hour; (6) must elevate the lower extremity six to eight hours per day; and (7) has difficulty to manipulate

20   and to see close objects.  (AR 71-72.)  Ms. Najarian testified that such person would be unable to

21   perform either plaintiff's past relevant work or jobs in the national economy.  (AR 72.)

22             As his hypothetical, plaintiff's attorney asked Ms. Najarian to apply the ALJ's first hypothetical

23   and to further assume inability to perform more than simple repetitive tasks.  (AR 72.)  Ms. Najarian

24   testified there would be a 50 percent erosion in the numbers of the three identified occupations.  (AR

25   72.)  Ms. Najarian testified there would be no further erosion if the hypothetical person needed to use

26   a cane to rise from sitting, stand or walk because the jobs are sedentary.  (AR 73.)  Plaintiff's attorney

27   added to his hypothetical the need to elevate feet two out of eight hours.  (AR 73.)  Ms. Najarian testified

28   that such further limitation would eliminate all jobs "unless an employer was willing to make some type

of an accommodation."  (AR 73.)  Plaintiff's attorney added to his hypothetical a moderate depth perception problem to affect the hypothetical person 50 percent of the workday but excluded the cane use and feet elevation.  (AR 73.)  Ms. Najarian testified that the depth perception limitation would eliminate all jobs in the three identified occupations and that such jobs require close up visual and hand activity.  (AR 74.)

### The ALJ's Findings

With his March 23, 2004 decision, the ALJ identified the specific issue as whether plaintiff is under a disability, defined as inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  (AR 17.)  In concluding that plaintiff is able to adjust to work that exists in significant numbers in the national economy, is not disabled, and is ineligible for SSI, the ALJ found:

1.  Plaintiff's osteoarthritis and cataracts are severe but do not meet or medically equal an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

2.  Plaintiff's allegations regarding her limitations are not totally credible.

3.  Plaintiff has the residual functional capacity to lift/carry 10 pounds occasionally and up to 10 pounds frequently; to sit six hours of an eight-hour workday; to stand/walk two hours of an eight-hour workday; and to balance, stoop, kneel, crawl and crouch occasionally.  Plaintiff is unable to climb ropes, ladders or scaffolds, should avoid far visual acuity activities, and should avoid moderate exposure to dangerous moving machines and dangerous heights.

4.  Plaintiff is unable to perform her past relevant work and has no transferable skills from any past relevant work and/or transferability of skills is not an issue.

5.  Plaintiff has the residual functional capacity to perform a significant range of sedentary work.

6.  There are a significant number of jobs in the national economy which plaintiff is able to perform although plaintiff's exertional limitations preclude her to perform the full range

13

1    of sedentary work and using section 201.28 of the Medical-Vocational Guidelines, 20

2    C.F.R., Part 404, Subpart P, Appendix 2.  Such jobs include cashier (15,169 jobs in

3    California and 144,684 jobs in United States), assembly worker (10,832 jobs in

4    California and 105,975 jobs in United States), and production worker (6,542 jobs in

5    California and 67,595 jobs in United States).  (AR 24.)

6                                    **DISCUSSION**

7                              **Standard Of Review**

8         Congress has provided limited judicial review of a Commissioner's decision made through an

9    ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

10   supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's

11   decision, made through an ALJ, when the determination is not based on legal error and is supported by

12   substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of*

13   *Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant

14   could perform light work contrary to treating physician's findings).[1]  Substantial evidence is "more than

15   a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a

16   preponderance,  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial

17   evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion."

18   *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

19        The record as a whole must be considered, weighing both the evidence that supports and detracts

20   from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

21   substantial evidence to support the administrative finding, or if there is conflicting evidence that will

22   support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

23   *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than

24   one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

25   *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

26   _____

27        [1]       "The district court properly affirms the Commissioner's decision denying benefits if it is supported by
     substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th
28   Cir. 1997).

                                            14

1   Cir. 1999).

2       This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

3   is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

4   whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

5   reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

6       Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

7   and detailed objective medical reports of his condition from licensed medical professionals."  *Meanel*

8   *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

9   Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

10  404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

11  or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

12  whether you are disabled or blind.  You are responsible for providing that evidence.")

13      Here, plaintiff claims disability since July 1, 1996 due to hands, hips, tail bone and knee pain,

14  arthritis, Blounts disease, Schneider corneal dystrophy, reduced vision, eye surgery, heart murmur,

15  hypertension, diabetes, shoulder bursitis, compressed vertebrae, and depression.  (AR 119, 132.)

16      With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's March

17  23, 2004 decision.

18                                  **Impairments**

19      Plaintiff argues that the ALJ erred to find only cataracts and osteoarthritis as severe impairments

20  and failed "to adequately examine the combined effects of multiple additional impairments."  The

21  Commissioner responds that the "proper issue . . . is not whether a different fact-finder might render a

22  different administrative decision; rather, the issue is whether substantial evidence supports the finding

23  that the ALJ made."

24      The SSA regulations provide: "If you do not have any impairment or combination of impairments

25  which significantly limits your physical or mental ability to do basic work activities, we will find that

26  you do not have a severe impairment and are, therefore, not disabled."  20 C.F.R. §§ 404.1520(c),

27  416.920(c).  "Basic work activities" are the "abilities and aptitudes necessary to do most jobs," including

28  "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling" as well as

"[u]nderstanding, carrying out, and remembering simple instructions." 20 C.F.R. §§ 404.1521(b)(1), (3), 416.921(b)(1), (3).  At step two of the five-step disability analysis, "the ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, and without regard to whether each alone was sufficiently severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). Such inquiry "is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290 (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-154, 107 S.Ct. 2287, 2297-2298 (1987)).

The purpose of the Listing of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (quoting Social Security Ruling ("SSR") 83-19, Dept. of Health and Human Services Rulings 90 (Jan. 1983)). If a claimant meets or equals a listed impairment, he/she is disabled. *Tackett*, 180 F.3d at 1099.

The United States Supreme Court has explained application of the Listing of Impairments:

> The listings . . . are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results.  For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . . "The level of severity in any particular listing section is depicted by the *given set* of findings and not by the degree of severity of any single medical finding – no matter to what extent that finding may exceed the listed value."
>
> . . .
>
> The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity."

*Sullivan*, 493 U.S. at 530-531, (italics in original; citations omitted).

"While the Listing of Impairments does describe conditions that are generally considered severe enough to prevent a person from doing any gainful activity, an ALJ should not consider a claimant's 'impairment to be one listed in Appendix 1 solely because it has the diagnosis of a listed impairment. It must also have the **findings** shown in the Listing of that impairment.'" *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d)); *Key v. Heckler*, 754 F.2d 1545, 1549-1550 (9th Cir. 1985)) (bold added).

Plaintiff bears the burden to prove that she has an impairment that meets or equals one of the

1    listed impairments. *Tackett*, 180 F.3d at 1098. To "meet" a listed impairment, a claimant must establish

2    that he or she meets each characteristic of a listed impairment relevant to his/her claim. *Tackett*, 180

3    F.3d at 1099. To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory

4    findings at least equal in severity and duration to the characteristics of a relevant listed impairment.

5    *Tackett*, 180 F.3d at 1099. Medical equivalence must be based on medical findings in the evidence

6    supported by medically acceptable clinical and laboratory diagnostic techniques. *Tackett*, 180 F.3d at

7    1100; 20 C.F.R. §§ 404.1526(b) and 416.926(b).

8         As a matter of law, the ALJ need not "state why a claimant failed to satisfy every different

9    section of the listing of impairments," in particular when the ALJ's evaluation of the evidence is an

10   adequate statement of the "foundations on which the ultimate factual conclusions are based." *Gonzalez*

11   *v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990). "An ALJ is not required to discuss the combined effects

12   of a claimant's impairments or compare them to any listing in an equivalency determination, unless the

13   claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683; *see Lewis v.*

14   *Apfel*, 236 F.3d 503, 514 (9th Cir. 2001).

15        Here, plaintiff's medical record includes notations to a series of ailments which plaintiff cites

16   in her opening brief and including obesity, bilateral hand neuropathy, carpal tunnel syndrome, diabetes

17   with neuropathy, heart murmur/arrthymias, shoulder bursitis, hypertension and chronic obstructive

18   pulmonary disease. Despite notation of such ailments, plaintiff fails to specify a listing which she

19   believes she meets or equals. There is no evidence that plaintiff's cited ailments limit her functioning.

20   Neither the treatment notes nor diagnoses address plaintiff's limitations attributable to her cited ailments.

21   Plaintiff fails to establish that her cited ailments meet or equal an impairment in the Listing of

22   Impairments. Plaintiff makes no effort to demonstrate how her cited ailments, alone or in combination,

23   meet specified medical criteria of or findings shown in the Listing of Impairments.

24        As noted by the Commissioner, plaintiff's reliance on her obesity is misplaced. Plaintiff did not

25   claim obesity as a condition to limit her ability to work. (AR 132.) The medical record does not identify

26   obesity as a functionally limiting impairment and does not reveal recommendations to lose weight.

27   Obesity was not raised as an issue at the ALJ hearing. "As obesity is not a separately listed impairment,

28   a claimant will be deemed to meet the requirements if 'there is an impairment that, in combination with

17

1  obesity, meets the requirements of a listing." *Burch*, 400 F.3d at 682 (quoting SSR 02-01p).  As noted

2  above, plaintiff fails to meet her burden to demonstrate that an impairment plus obesity meets

3  requirements of the Listing of Impairments.  Plaintiff's comments as to the ALJ's evaluation of the

4  medical record appear to hold the ALJ to a standard not otherwise established by law.

5                                          **Dr. Poonia's Opinion**

6         Plaintiff challenges the ALJ's evaluation of Dr. Poonia's assessment and argues that Dr. Poonia's

7  assessment "is supported by the treatment records" and "should be given controlling weight."  The

8  Commissioner responds that the ALJ properly rejected Dr. Poonia's assessment because it is inconsistent

9  with his treatment records and unsupported by objective medical evidence.

10        A treating physician's opinion is not conclusive as to a claimant's physical condition or the

11  ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *Matney*

12  *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th

13  Cir. 1989); *Magallanes*, 881 F.2d at 751.[2]  An ALJ may reject a treating physician's opinion whether

14  or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical

15  findings to support its conclusion."  *Magallanes,* 881 F.2d at 751.  Inconsistencies and ambiguities in

16  a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject

17  the opinion.  *Matney*, 981 F.2d at 1020.

18        The Ninth Circuit has further explained:

19              To reject the opinion of a treating physician which conflicts with that of an
              examining physician, the ALJ must "'make findings setting forth specific, legitimate
20              reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ
              can meet this burden by setting out a detailed and thorough summary of the facts and
21              conflicting clinical evidence, stating his interpretation thereof, and making findings." .
              . . The rule . . . does not apply, however, "when the nontreating physician relies on
22              independent clinical findings that differ from the findings of the treating physician." . .
              . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical
23              tests, it must be viewed as substantial evidence . . .'"

24  *Magallanes*, 881 F.2d at 751(citations omitted.)

25        An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See,*

26

27        [2]        A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an
    administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e).  The Commissioner has final responsibility
28  to determine a claimant's residual functional capacity.  20 C.F.R. § 404.1546.

1   *e.g., Sandgathe*, 108 F.3d at 980.  A physician's opinion of disability "premised to a large extent upon

2   claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

3   have been "properly discounted."  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v.*

4   *Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d

5   520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able

6   to find a link between [claimant's] complaints and known medical pathologies").

7        "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

8   testimony, and for resolving ambiguities."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

9   Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

10  specific, legitimate reasons to reject the opinion.  *Matney*, 981 F.2d at 1020.

11       As a reminder, Dr. Poonia completed a February 9, 2003 Complete Medical Report (Physical)

12  to note that plaintiff "is very limited to physical exertion due to condition of knees and other health

13  conditions." (AR 308.)  Dr. Poonia assessed that plaintiff is unable to lift/carry, stand/walk, use her left

14  foot, climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push/pull, hear, or speak. (AR 309,

15  310, 311.)  Dr. Poonia noted that plaintiff is able to: (1) sit one hour in an eight-hour workday; (2)

16  lie/elevate three hours in an eight-hour workday; (3) occasionally engage in simple grasping and fine

17  manipulation with her right hand; and (4) occasionally use her right foot. (AR 310.)

18       After detailing the medical record, including Dr. Poonia's treatment (AR 19-21), the ALJ

19  properly discounted Dr. Poonia's assessment:

20       Dr. Poonia's assessments in Exhibit B-12F [AR 308-312] regarding symptoms and
         resulting limitations [are] not generally credible and [are] to be given no weight because
21       his records are inconsistent with the limitations assigned in the exhibit. The claimant's
         relevant medical records show that the treating physician responded with limited and
22       conservative treatment.  Such treatment is inconsistent with the medical response in
         Exhibit B-12F that would be expected if the symptoms and limitations were as severe as
23       described by the physician.  In addition, the undersigned wrote a letter to Dr. Poonia
         asking him to clarify his findings[,] and his responses were x-ray results which did not
24       address my specific questions (Exhibit B-14F).  (AR 21.)

25       The ALJ appropriately discarded Dr. Poonia's February 9, 2003 Complete Medical Report

26  (Physical) responses which lacked explanation of the broad limitations imposed by Dr. Poonia.  (AR

27  195.)  Dr. Poonia's vague objective findings fail to substantiate his assessment.  The ALJ was entitled

28  to reject Dr. Poonia's assessment in that it is "brief and conclusory in form with little in the way of

1   clinical findings to support its conclusion." *Magallanes*, 881 F.2d at 751.  Dr. Poonia's cryptic form

2   responses are not entitled to deference.  *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *Murray v.*

3   *Heckler*, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions

4   over check off forms); *see Batson v. Commissioner*, 359 F. 3d 1190, 1195 (9th Cir. 2003) (ALJ properly

5   discounted a physician's checklist form view which lack supportive evidence, was contradicted by other

6   statements and assessments of claimant's condition, and was based on claimant's subjective

7   descriptions).  To compound the problem for plaintiff, Dr. Poonia failed to meaningfully respond to the

8   ALJ's request for further information and clarification regarding Dr. Poonia's sweeping conclusions.

9        Moreover, Dr. R. Damania's examination revealed far less reaching limitations.  Dr. R.

10  Damania's examination revealed plaintiff's swollen knees with "generalized tenderness" and moderate

11  deformities.  (AR 221, 224.)  Dr. R. Damania's examination of plaintiff's extremities, other joints, and

12  spine revealed normal range of motion and was unremarkable.  (AR 221, 224.)  Dr. R. Damania assessed

13  no limitations of exertional, postural with bending or stooping, or manipulative with reaching, handling,

14  feeling, grasping or fingering.  (AR 223.)  Dr. R. Damania placed limitations on kneeling, climbing and

15  crouching.  (AR 223.)  Dr. Torre concluded that plaintiff is able to: (1) lift/carry 10 pounds occasionally

16  and less than 10 pounds frequently; (2) stand/walk at least two hours in an eight-hour workday; (3) sit

17  about six hours in an eight-hour workday; and (4) occasionally balance, stoop, kneel, crouch and crawl.

18  (AR 293.)  Dr. Torre noted plaintiff's lower extremities limitations from marked osteoarthritis knee

19  joint.  (AR 292.) Dr. Torre placed neither manipulative, communicative nor environmental limitations,

20  except avoidance of hazards.  (AR 294, 295.)  Another DDS physician affirmed Dr. Torre's assessment.

21  (AR 297.)  As discussed below, the ALJ discounted plaintiff's allegations of limitations to cast further

22  doubt on Dr. Poonia's assessment.  Plaintiff points to no error in the ALJ's resolution of conflicts and

23  in turn, rejection of Dr. Poonia's unsupported assessment.

24                                    **Dr. Fogg's Opinion**

25        Plaintiff argues that the ALJ improperly addressed "the visual opinion evidence from the treating

26  source, which had numerous and distinct vision limits for depth perception, near vision, far vision,

27  handling objects, and exposure to glare or night."  The Commissioner disagrees and points out that Dr.

28  Fogg found plaintiff's best corrected vision of 20/40 in her left eye and 20/30 in her right eye.  (AR 307.)

1     The ALJ applied Dr. Torre's restrictions to avoid activities requiring far visual acuity. (AR 22.)
2 Dr. Torre had noted plaintiff's 20/50 near vision, a greater functional restriction than Dr. Fogg's.  (AR
3 294.)  Plaintiff fails to convince this Court to disturb the ALJ's interpretation of the medical evidence
4 as to plaintiff's vision and Dr. Fogg's assessment.

5 **Plaintiff's Credibility**

6     Plaintiff takes issue with the ALJ's credibility evaluation and argues that the ALJ "failed to give
7 adequate reasons for rejecting [plaintiff's] credibility."  The Commissioner responds that "the ALJ
8 properly discredited [plaintiff's] subjective complaints of 'excess pain' and other disabling symptoms"
9 and that substantial evidence supports the ALJ's legally sufficient reasons to discredit plaintiff.

10     "Credibility determinations are the province of the ALJ."  *Fair v. Bowen*, 885 F.2d 597, 604 (9th
11 Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe
12 every allegation of disabling pain."  *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-
13 serving statements."  *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir.
14 1995).

15     A claimant bears an initial burden to "produce objective medical evidence of underlying
16 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably
17 be expected to produce pain or other symptoms.'" *Baston v. Commissioner of Social Security Admin.*,
18 359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen*, 80 F.3d at 1281)).  If a claimant satisfies such
19 initial burden and "if the ALJ's credibility analysis of the claimant's testimony shows no malingering,
20 then the ALJ may reject the claimant's testimony about severity of symptoms with 'specific findings
21 stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196 (quoting *Smolen*, 80 F.3d
22 at 1284).  "If the ALJ finds that the claimant's testimony as to the severity of her pain and impairments
23 is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit
24 the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v.
25 Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

26     If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing
27 court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse
28 an ALJ's credibility determinations "based on contradictory or ambiguous evidence." *Johnson*, 60 F.3d

at 1434 (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).  "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character evidence."  *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to draw inferences 'logically flowing from the evidence.'"  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.  *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An ALJ's finding that a claimant generally lacked credibility is permissible basis to reject excess pain testimony.

*See also* SSR 96-7p.[3]

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

1.  The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

2.  Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

3.  Type, dosage, effectiveness, and adverse side-effects of pain medication;

4.  Treatment, other than medication, for pain relief;

5.  Functional restrictions;

6.  Claimant's daily activities;

7.  Unexplained, or inadequately explained, failure to seek treatment or to follow up a

---

[3]     SSR 96-7p sets out factors to assess a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, claimant receives or has received for relief of pain or other symptoms; (6) measures other than treatment claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

22

1    prescribed course of treatment; and

2        8.    Ordinary techniques to test a claimant's credibility.

3    *Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

4        The ALJ found that plaintiff's "allegations regarding her limitations are not totally credible."

5    (AR 24.)   The ALJ noted that plaintiff's "relevant medical records" demonstrated that treating physician

6    Dr. Poonia "responded with limited and conservative treatment." (AR 21.)   The ALJ further noted that

7    such treatment is "inconsistent" with that expected "if the symptoms and limitations were as severe as

8    described by the physician."  (AR 21.)  When asked to describe his treatment of plaintiff, Dr. Poonia

9    merely noted "medications."  (AR 308.)  *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ

10   properly considered treating physician's failure to prescribe and claimant's failure to request "any serious

11   medical treatment for this supposedly excruciating pain."); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th

12   Cir. 1995) ("conservative treatment" suggests "a lower level of both pain and functional limitation.");

13   *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (en banc) "unexplained, or inadequately explained,

14   failure to seek treatment or follow a prescribed course of treatment" is relevant to assess credibility);

15   *see also Flaten v. Secretary of Health & Human Servs.*, 44 F.3d 1453, 1464 (9th Cir. 1995) (ALJ entitled

16   to draw inference from general lack of care).  Dr. Poonia consistently treated plaintiff's osteoarthritis

17   with Motrin 800 mg.  (AR 237, 252, 259, 334.)  There is no record of meaningful treatment for

18   plaintiff's pain other than medication.

19       As noted by the Commissioner, objective medical evidence fails to support plaintiff's subjective

20   allegations of disabling limitations.  Although Dr. R. Damania noted osteoarthritis problems with

21   plaintiff's knees, his examination of plaintiff's other joints, extremities and spine revealed normal range

22   of motion and was unremarkable.  (AR 221, 224.)  Nerve conduction studies revealed at most "very

23   mild" conditions to discredit plaintiff's complaints of hand problems.   (AR 262.)   Plaintiff

24   acknowledged to psychiatrist Dr. S. Damania that plaintiff did not treat with a therapist or psychiatrist.

25   (AR 227.)   Dr. S. Damania's mental status examination revealed that plaintiff was "pleasant,

26   appropriate, and related well" and had intact memory, attention span within normal limits, and average

27   intelligence. (AR 228, 229.) Dr. S. Damania noted plaintiff's excellent interpersonal and social skills

28   and ability to understand, carry out and remember simple job instructions, mental limitations.  (AR 229.)

23

1    According to Dr. S. Damania, any mental limitations "are as a result of the subjective symptomatology
2    of bilateral knee pain." (AR 229.) Ophthalmology treatment notes indicated the absence of retinopathy
3    despite plaintiff's diabetes. (AR 198.) Although the ALJ provided Dr. Poonia a further opportunity to
4    support plaintiff's claims, Dr. Poonia merely pointed to x-ray reports indicating osteoarthritis to
5    plaintiff's knees. (AR 346-349.) *See Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("Given all of
6    the evidence in the record, there is substantial evidence that [claimant's] physical impairments were not
7    severe prior to the expiration of her insured status.") Plaintiff failed to demonstrate an impairment
8    commensurate with her alleged limitations.

9         There is further evidence to support the ALJ's credibility finding. Plaintiff acknowledged that
10   she has not worked since she first became pregnant in 1980. (AR 48, 132.) "[T]he ALJ is entitled to
11   draw inferences 'logically flowing from the evidence.'" *Marci v. Chater*, 93 F.3d 540, 544 (9th Cir.
12   1996) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). A logical inference is that
13   plaintiff chose a path other than work. In addition, on a daily basis, plaintiff assists her children to
14   prepare for school, performs house work, cleans dishes, and watches television. (AR 68, 127, 153.)
15   Plaintiff is able to care for herself, prepare simple meals, shop weekly, and wash clothes. (AR 127, 128,
16   129, 158.) Plaintiff meets her children when they return from school. (AR 128.) *See Curry v. Sullivan*,
17   925 F.2d 1127, 1130 (9th Cir. 1991) (proper consideration given to claimant's ability "to take care of
18   personal needs, prepare easy meals, do light housework, and shop for some groceries.") Although
19   plaintiff claims severe vision problems, she testified that she is able to see up to 150 feet. (AR 62.)
20   Plaintiff's claim that she has difficulty typing is inconsistent with her reading the newspaper online. (AR
21   66, 68.) Plaintiff acknowledged no problems from her medication, except upset stomach from
22   Ibuprofen. (AR 68.) The medical record lacks notations that plaintiff complained of upset stomach.
23   Although more from the ALJ on his limited credibility finding would have been helpful, this Court is
24   not in a position to second guess the ALJ.

25                          **CONCLUSION AND RECOMMENDATIONS**

26        For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ
27   properly concluded plaintiff is not disabled. This Court further finds that the ALJ's decision is supported
28   by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

1   Court RECOMMENDS to:

2         1.     DENY plaintiff's request to reverse the Commissioner's decision to deny plaintiff SSI

3               or to remand for further proceedings; and

4         2.     DIRECT this Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart,

5               Commissioner of Social Security, and against plaintiff Lynda Weaver and to close this

6               action.

7        These findings and recommendations are submitted to the district judge assigned to this action,

8   pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304. No later than August 1, 2006,

9   any party may file written objections to these findings and recommendations with the Court and serve

10  a copy on all parties and the magistrate judge and otherwise in compliance with this Court's Local Rule

11  72-304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings and

12  Recommendations." Responses to objections shall be filed and served no later than August 11, 2006

13  and otherwise in compliance with this Court's Local Rule 72-304(d). A copy of the responses shall be

14  served on the magistrate judge. The district judge will review the magistrate judge's findings and

15  recommendations, pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file

16  objections within the specified time may waive the right to appeal the district judge's order. *Martinez*

17  *v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

18       IT IS SO ORDERED.

19  **Dated:   July 18, 2006**              **/s/ Lawrence J. O'Neill**

20  66h44d                     UNITED STATES MAGISTRATE JUDGE